**McBURNEY et al. v. KNOX.   (No. 996.)** *

(Court of Civil Appeals of Texas. Beaumont.
March 5, 1924. Rehearing Denied
March 19, 1924.)

1. **Tenancy in common** &#9758;15(2)—**Tenant in possession repudiating cotenant's title may claim protection of statute of limitations against cotenant.**

The possession of a cotenant will be presumed to be in right of the common title, and the tenant in possession will not be permitted to claim protection of the statute of limitations, unless it clearly appears that he has repudiated the title of his cotenant and is holding adversely.

2. **Adverse possession** &#9758;58, 88—**Possession and payment of taxes not assertion of adverse claim.**

Possession and payment of taxes alone on property do not constitute assertion of an adverse claim.

3. **Tenancy in common** &#9758;15(7, 8)—**To affect tenant with cotenants' adverse holding, notice of assertion of adverse claim necessary.**

To affect cotenants with an adverse holding by their cotenant, notice of such fact must be brought home to them either by information given by the tenant asserting claim or by such acts as will raise a presumption of notice.

4. **Tenancy in common** &#9758;15(7, 8)—**Possession by tenant under deed adverse to cotenant having knowledge.**

When a tenant is in actual possession, asserting an exclusive right to the whole property under deed conveying to him the property by specific description, and cotenants know of the existence of such deeds, and there exist circumstances that show that the one so holding is claiming under the deeds, his possession will be considered in keeping with the title under which he claims, and will be regarded as adverse to his cotenants.

5. **Tenancy in common** &#9758;15(7, 8)—**Registration of deeds under which tenant in common claimed held notice of adverse possession.**

Registration of deeds under which a tenant in common claimed *held* to be notice to his cotenants of the existence thereof and of adverse claim to the land.

6. **Tenancy in common** &#9758;15(7, 8)—**Possession of grantee under deed for whole land by one tenant in common adverse to cotenant.**

When one of several tenants in common executes deed purporting to convey the entire premises to one who places his deed of record and enters possession claiming title thereto, such possession is hostile to the cotenants, and they are charged with knowledge of the hostile character thereof, and after expiration of limitation their rights will be barred.

7. **Adverse possession** &#9758;20 — **Encroachment occurs when adjoining owner extends improvements over the land.**

Encroachment occurs where one who owns adjoining land and has improvements thereon extends his improvements over his line onto the adjoining land, and thus occupies and uses the land thus inclosed.

8. **Adverse possession** &#9758;19—**Facts held to make doctrine of encroachment inapplicable.**

Where the possession of one claiming land by limitation was by agreement with one who held deed thereto and claimed the entire tract, and the first land cleared and fenced by him was near the center and was gradually extended to near the edge, it was not an encroachment over the line from without, but was a beginning within and an extension outward, and the doctrine of encroachment was therefore inapplicable.

Appeal from District Court, Sabine County; V. H. Stark, Judge.

Trespass to try title by Nora Walker McBurney and others against Hiram Knox. From judgment for defendant, plaintiffs appeal. Affirmed.

See, also, 111 Tex. 510, 241 S. W. 1000.

W. D. Gordon, of Beaumont, and J. W. Minton, of Hemphill, for appellants.

Chester B. Collins, of Lufkin, for appellee.

O'QUINN, J. September 9, 1914, appellants, as plaintiffs below, brought this suit in the district court of Sabine county in trespass to try title against appellee, seeking to recover an undivided 177 acres interest in a 354-acre tract out of the William Isaacs league survey in Sabine county. The defendant, Knox, answered by plea of not guilty, and specially pleaded the three, five, and ten year statutes of limitation. This is the second appeal in this case. On the first trial judgment was for appellee, Knox, on his defense of five years limitation, and that judgment was affirmed by this court. 191 S. W. 730. Writ of error was granted, and the judgment was reversed and the cause remanded by the Supreme Court, it holding that under the facts as adduced on that trial, there was no actual and visible appropriation of the 354 acres of land, save the inclosed portion, about 26 acres, commenced and continued under a claim of right hostile to the title of plaintiffs, such as was requisite to mature title by limitation under article 5681, Revised Statutes. In remanding the case, the Supreme Court concluded its opinion as follows:

"Being without proper data to segregate the uninclosed land from the inclosed land, final judgment will not be here rendered; but it is ordered that judgments of the district court and of the Court of Civil Appeals be reversed and the cause remanded for a new trial in the district court."

At the fall term of the district court, 1922, the case was again tried before the court without a jury, and judgment was rendered for defendant sustaining his limitation defenses, from which this appeal is taken.

---

&#9758;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted May 14, 1924.

259 SOUTHWESTERN REPORTER (Tex.

The court made and filed his findings of fact, which, because of their length, are not incorporated into this opinion, but we find that same are sufficiently supported by the record. Appellants have not leveled any assignments of error against said findings, as not being supported by the evidence, but challenge the court's conclusions of law as being erroneous.

The case is before us on two assignments of error, to the effect that the court erred in hearing evidence on the limitation pleas of defendant and on the evidence adjudging the land to the defendant, it being urged that there is no proof in the record which, as a matter of law, justifies the judgment, and that the trial court should, under the judgment of the Supreme Court on former appeal, have heard evidence establishing the bounds of the 26 acres of land inclosed by Garlington, and have decreed same to defendant under his plea of limitation.

The record discloses that on May 12, 1845, the 354½ acres of land in controversy was conveyed by William Isaacs, the original grantee, to William A. Donahoe, describing same by metes and bounds. Thereafter William A. Donahoe died, leaving surviving him his wife, Harriett A. Donahoe, and one son, Thomas J. Donahoe, the land in controversy being a part of the community estate of William A. Donahoe and his wife, Harriett. Harriett A. Donahoe subsequently married R. J. Jennings. On March 15, 1871, Thomas J. Donahoe, the son, executed a warranty deed to R. J. Jennings, his stepfather, for the entire 354½ acres of land. This deed was duly recorded. On May 10, 1871, Harriett A. Jennings, the wife of R. J. Jennings, executed a deed to her said husband, in which she understook to convey to him all her right and title in and to said land. This deed was not joined in by her husband, and was not properly acknowledged, and therefore did not accomplish the purpose of conveying her title. This deed was recorded in the deed records of Sabine county July 4, 1871. On May 10, 1871, R. J. Jennings, joined by his wife, Harriett Jennings, by deed undertook to convey the entire 354½ acres of land to John H. Derrough. This deed was recorded in the deed records of Sabine county July 4, 1871. The wife's separate acknowledgment to this instrument is fatally defective. On May 19, 1900, J. H. Derrough conveyed by warranty deed the entire 354½ acres to W. H. Knox, which deed was duly recorded January 18, 1901. Appellee, Hiram Knox, son of W. H. Knox, at the date of the instant trial was the owner of this title. By reason of the defective acknowledgment of Harriett A. Jennings, her interest did not pass under her conveyances, and only an undivided one-half interest in and to the said 354½ acres of land was legally conveyed. Thomas J.

Donahoe died without issue in 1878. Harriett A. Jennings, by her second marriage to R. J. Jennings, had two daughters, one of whom died without issue, and the other married Thomas W. Howeth, and the appellants herein are the children of said marriage. Both Harriett A. Jennings and her husband, R. J. Jennings, are long since dead. This controversy is between appellee and the children of Mrs. Howeth, and the sole question presented for our determination is whether or not the plea of limitation urged by appellee was properly sustained.

In the first trial, the only issue presented to the court was the question of five years limitation under a deed duly registered and the payment of all taxes for a period of five years, beginning in 1905. Walker v. Knox (Tex. Civ. App.) 191 S. W. 732; McBurney v. Knox, 111 Tex. 510, 241 S. W. 1000. In that trial it was merely shown that W. H. Garlington entered upon the land in controversy in 1895 and cleared and fenced some 15 acres of land. There was no explanation of by what authority, if any, he did so. That in February, 1905, Knox, finding him on the land, entered into an agreement with him, by which he became the tenant of Knox, and was to continue to hold the 354½ acres of land for Knox, for which he, Garlington, was to receive a deed from Knox to that portion of the land covered by his improvements; that since the time of this agreement Garlington has been holding the land as the tenant of Knox, and has made a crop on it every year; that on September 28, 1910, Garlington executed a further acknowledgment of tenancy to Knox, as follows:

"The State of Texas, County of Sabine.

"Know all men by these presents, that I, W. H. Garlington, do hereby acknowledge that W. H. Knox, of Dallas county, Tex., is the owner of the following described property, to wit: Being 354½ acres of the William Isaacs headright survey of land situated in Sabine county, Tex., and being the same 354½ acres of said survey which was conveyed by William Isaacs and wife, Sarah Isaacs, to William A. Donahoe by deed dated May 12, 1845, which deed is now of record in volume 50, pages 93 et seq. of the Deed Records of Sabine county, Tex., reference to which records is hereby made for better description of said land.

"And that I am now and have been in the actual possession of all of said 354½ acres for about fourteen years, to wit: All of said 354½ acres of land set out and described in the deed from Wm. Isaacs and wife to William A. Donahoe, dated May 12, 1845, and of record in volume 50, pages 93 et seq. of the Deed Records of Sabine county, Tex., said survey being located in the southwest corner of the Wm. Isaacs league in Sabine county, Tex., and that my possession of said survey of land is and has been as a tenant at will of said W. H. Knox, and I agree to surrender unto the said W. H. Knox or his agent or assigns the possession thereof at any time upon 30 days' written notice, and in consideration of the use of the property aforesaid, I hereby agree to hold

possession of the entire property, including the part described, as the tenant of said W. H. Knox, and as far as I may be able to do so, will keep trespassers off of said property.

"Witness my hand this the 28th day of September, A. D. 1910.

"[Signed]   W. H. Garlington.
"Witnesses:
  "W. F. Goodrich.
  "J. D. Ford."

On October 4, 1910, some six years after the original agreement of tenancy was made, they entered into the following written agreement:

"The State of Texas, County of Sabine.

"Know all men by these presents, that I, W. H. Knox, of said county and state, did on the 5th day of July, 1905, let and lease to W. H. Garlington, 354½ acres of land off of the William Isaacs survey situated, lying and being in Sabine county, Tex., and described as follows: Beginning at the southwest corner of a survey made, for Willis Donahoe, and running thence south, 81 east with Donahoe's line, 830 varas to a corner, a stake, bearing S. 65 W. a pine 20 links, 18 inches in diameter, S. 22′ 0″ 30 links, a pine 6 inches in diameter. Thence S. 9 W. 2400 vrs. to a corner, stake bearing N. 26 W. 11 vrs. 21 links pine 18 inches in diameter north 60 east 10 links 18 inches. Thence N. 81 W. with the William Isaacs league line. Thence N. 9 E. with the William Isaacs league line to the beginning corner.

"And, whereas, said W. H. Garlington has held said land in his possession for the said W. H. Knox ever since the 5th day of July, 1905, and is yet in possession of same by having about 15 or 20 acres inclosed and in cultivation; and

"Whereas, the said Garlington is now the tenant of the said W. H. Knox; and

"Whereas, the said W. H. Knox is desirous of compensating the said W. H. Garlington for his tenancy of said land:

"Therefore, the said W. H. Knox does hereby obligate and bind himself to make to the said W. H. Garlington a deed for 26 acres of said land to include that portion of said 354½ acres of land now under fence and in cultivation by said W. H. Garlington, which 26 acres is described as follows, to wit:

"Beginning at the northeast corner of a 354½-acre survey off of said league deeded by William Isaacs and wife to William A. Donahoe by deed dated May 1, 1845, thence north 18 west about 300 vrs. to a corner post oak and sweet gum marked X. Thence south 9 west 500 vsr. to corner two post oaks marked X. Thence south 81 east to east line of said 354½ acres. Thence north 9 east to the place of beginning.

"Which said deed to said 26 acres of land is conditioned as follows: That, whereas, there is now a suit pending in the district court of Sabine county, Tex., wherein W. H. Knox is plaintiff and M. E. McKechney and others are defendants, No. 1520½, pending in the district court of Sabine county, Tex., and whereas, said suit has never been tried and disposed of; and

"Whereas, the said W. H. Knox claims the 354½ acres of land, and whereas, the defend-

ants in said suit claim one undivided one-half interest undivided in said lands:

"Now, therefore, if the said W. H. Knox shall recover in said suit, or otherwise establish his title to the said 354½ acres of land, then the said W. H. Knox shall make to the said W. H. Garlington an absolute deed to said 26 acres of land above described. If, however, the said W. H. Knox does not establish his title to but one-half of said 354½ acres of land, then the said W. H. Knox will make an absolute deed to the said W. H. Garlington to an undivided one-half interest in said 26 acres of land, reserving, however, in any event, all the merchantable saw timber now standing, growing or being situated upon 26 acres of land or so much thereof as may be deeded to said W. H. Garlington by virtue of this contract.

"And I, the said W. H. Garlington, having examined the above and foregoing contract, do hereby agree to all the stipulations and conditions therein contained, and hereby agree to hold possession of said 354½ acres of land for the said W. H. Knox until his title shall have been established to the same or any part thereof, with the right to use so much of said land as may be inclosed and in cultivation free of any rental charges therefor, other than to hold the said 354½ acres of land as the tenant of said W. H. Knox.

"Witness our hands on this the 4th day of October, 1910.

"[Signed]   W. H. Knox.
            "W. H. Garlington."

This instrument was properly acknowledged.

On the instant trial, in addition to the above, the following testimony was adduced:

W. H. Garlington testified:

"* * * In the year 1894 and 1895 I lived on a place up there north of where I live now about a mile, known as the Sank Wright, or J. T. Wright, place, I did not own that place. I was renting land. I was following the business of farming. I was a poor man at that time. I did not own any land anywhere at that time. I am pretty well acquainted with the William Isaacs 354 acres of land involved in this suit. The very first I knew of it was in 1889, I think, when George Greer ran the west line of the William Isaacs survey, and I carried the chain for him. That was George Greer, who used to be at San Augustine, and was afterwards a lawyer at Beaumont. * * * I knew where this land was in 1894 and 1895. After I surveyed with Mr. Greer, I was helping Mr. Arthur survey off a lot of land around up in there, and I was inquiring in regard to the land, and I got the address of a man by the name of J. H. Derrough from Mr. Scott Arthur. He told me that he was the original owner of that land, that 354 acres involved in this case. I learned that in 1894, but it was just after Christmas, a few days after Christmas, before I wrote to him. I wrote to him. I wrote him at Cleburne, Tex., the address Mr. Arthur gave me. I wrote him that I understood he owned a tract of land in there on the Isaacs league, and I was without a home and believed there was some good farming land on it, and if he would allow me to go ahead and clear up a little field I would do so. I addressed that

letter to Cleburne, Tex. I mailed it at Tebo. I got an answer to that letter in 10 or 15 days afterwards. He wrote to me that he had 354 acres lying in the southwest corner, principally down the league line of the William Isaacs, and if I would go on it as his tenant and take charge of the whole entire tract, and see after it and keep everything clear on it, I might clear up 10 or 12 acres, and I could have all I could make on it for ten years, and then he wouldn't be hard on me after the ten years. I haven't got that letter that I received from Mr. Derrough. I have lost it. I have looked for it everywhere and searched for it and couldn't find it. I looked in my trunks and among my papers, and I did not locate it at all. I went up to Tebo to mill, and when I got ready to go Mr. J. Brown and I came off together. We came out by the post office, and I got this letter, and, after we rode off down the road a piece, I opened the letter and read it, and I handed it to Mr. Brown. That was an interesting letter to me. I was interested in it. I did not have any place to live then without paying rent. I did not own any land anywhere. I was a married man and had a family, and I have been married ever since. After I got that letter, I talked to Mr. Brown about it, and he and I went over on the land and looked around over it, and we picked out a place that I might clear up a field. The place that I picked out was on this Isaacs land in this suit. At the time I picked out that place there was no field around there on the Isaacs. There was no field adjoining the Isaacs around there anywhere. I did not have any field anywhere around there. This place that I selected on the Isaacs was just about a mile from where I then lived. After I selected a place there, I went to work on it. Of course, I didn't do much work during the spring and summer on it. I cleared and burned up a lot of logs and split a few rails at times when I could leave my crop and get in there until in the fall of the year when I laid by, and then I went to work on it. It was about the last days of January or the first days of February when I first commenced chopping over there. When I began chopping and clearing, I commenced over in the tract and came towards the line. I suppose I commenced 250 or 300 yards over in the tract. I got about an acre or so cut off during the spring and summer. I also burned brush and split rails over there. In the summer, after I got through with my crop, I went ahead and cleared up 7 or 8 acres. That was in the summer of 1895. The letter that I received from Derrough was signed by J. H. Derrough. It was mailed from Cleburne. In the letter he said something about my keeping other people off of the tract. He told me to watch over it and see that nobody cut any timber off of it. He told me in the letter to take possession of the whole tract. Maybe a week or so after I went to work over there. Mr. Gilbert came to my house, and I went over and showed him where I had been at work, and he told me that I had better write to Mr. Derrough and accept his proposition, or somebody else might, and I then wrote him a letter and told him that I had commenced work on the land, and had accepted his proposition. Mr. Gilbert helped me word the letter. I told Mr. Derrough that I would look over the entire tract for him, take it in charge.

I don't reckon that was over a month after I got the first letter from Mr. Derrough. I mailed that letter to Mr. Derrough at Tebo. I addressed it to Cleburne, Tex. I did not keep any copies of the letters that I wrote to Derrough. Mr. Gilbert, John Gilbert, is my brother-in-law. He married my wife's sister. I agreed in the letter to Mr. Derrough to take charge of the land and look after it. I went there in the winter of 1895 and 1896 and split rails and fenced up this land and planted it in 1896. I fenced it up in the fore part of the year 1896, as soon as I cut my rails. I fenced it just after Christmas, sometime right in the fore part of the year. After I commenced clearing and cutting trees and timber on this land, I continued to work on it all the time every chance I got. I spent nearly all the summer of 1895 clearing on it. By the spring of 1896, I had in between 7 and 8 acres. I fenced that. I worked it that year. I have made a crop on it every year since then. I cleared more land on this tract in the fall after I laid by in 1896. That then made me something like 10 or 12 acres in all. I inclosed that under fence. I had about 10 or 12 acres under fence. I pastured my stock on this land. Of course, after I gathered my crop, I turned my stock in there. I kept the fence up all the year around. Nobody's stock except mine stays in there. In the latter part of 1896 and the beginning of 1897 I had 10 or 12 acres fenced and in cultivation. I made a crop on it in 1897. In 1897 I built a house. I didn't clear any more until in the spring of 1898. I built my house, I reckon, about 400 yards east of where I cleared this field. I did not build my house on the Isaacs. I built it on another piece of land. I mean I built a dwelling house. That was a house for me and my family to live in. I did not build this house on the Isaacs because I didn't have any authority from Mr. Derrough to build a house on it; clearing was the proposition I put up to him, and the proposition I accepted. Mr. Derrough told me I could clear 10 or 12 acres. I stated that I built the house in 1897. In the spring of 1898 I cleared some more land. I reckon I cleared about 3 acres in the spring of 1898. I cleared that land east of the Isaacs' line. I didn't clear it on the Isaacs because I didn't have any permission from Derrough to clear any more. After that, I still extended my field on towards my house. Later I had a good many acres in cultivation there off of the Isaacs. I kept on until I got about 30 or 40 acres in cultivation. Thirty acres, I reckon, wasn't on the Isaacs. I didn't clear more on the Isaacs because I didn't ask for any more, and that was all the trade was made for. I claimed possession of all the land in this suit. I claimed possession of the entire tract of land. When I extended my land out from the Isaacs I put it all in one field. I cleared right along the east boundary of the Isaacs. My first clearing off of the Isaacs was in 1898. For the first three years that I went there all of my clearing and field was on the Isaacs. I used that 10 or 12 acres there on the Isaacs until about 1905. Then I made a deal with Mr. Knox. When I went on this Isaacs land involved in this suit, I went on there as a tenant for Derrough. Arthur told me about it and I believed Arthur. * * * From the time that I went on this land and until Mr. Knox came

there in 1905, I claimed this land for Derrough, I was holding under the Derrough title. During the time I was there I loooked over the rest of the tract of land. I went over it nearly every week. There wasn't much occasion at that day and time to look after it because there wasn't much molesting. I cut board trees anywhere over the entire tract, and pastured my stock on the remaining part of the tract. I cut board trees anywhere over the entire tract whenever I got ready, and I hauled wood and pine off of it. Through the spring, summer, and winter my stock grazed on this entire tract, on the outside. If any one had challenged my right to be on that land or had undertaken to take possession of it or cut the timber off of it, I would have tried to stop him. From 1895 until Mr. Knox came there in 1905 nobody except me had possession of any of that land. I looked after it, and saw that nobody cut any timber off of it or took possession of it.

"From 1895, until Mr. Knox came there in 1905, I cultivated and used this land every year. I made a crop on it every year, and kept the fence up. I stated that Mr. Knox came there in 1905. I did not know at the time Mr. Knox came there that Derrough had sold this land. The first time I ever saw Knox I met him about a half a mile from where I now live. I was going to Bronson and met him and Mr. Arthur and Judge Mantooth all in a hack. Mr. Knox remarked to me, he says, 'I understand that you have got part of my land in cultivation over here.' I asked him where his land was, and what right he had to it, and he told me that he had bought this land from Derrough. After he told that he had bought from Derrough, of Cleburne, he took out the papers, and Judge Mantooth was reading them, and he told me if I wanted to continue to cultivate the land, if I would accept a tenancy under him, I could do so. He says, 'Now, if you will take this 354½ acres, and look after it all and watch over it for me and hold it as a tenant for me five years, I will absolutely give you a deed to a part of it, 25 or 30 acres.' He said he would cut my land off in a uniform shape. I agreed to that. I agreed to it because my time with Derrough was out, and he had bought from Mr. Derrough, and I was holding under him. I had heard of Mr. W. H. Knox. I had heard that he was a reliable man. I believed what he said when he told me he had bought the land from Derrough. I never told them that I had already been there under Derrough, because I was never asked the question. I did not think that made a bit of difference at all. My object was to get a field there. That was some time something like in the first of the summer or spring; I disremember now. I executed a lease not long afterwards to Mr Knox. That lease that I executed was in 1910. I think it was some time in the early summer when Mr. Knox came there. The first time he came there was in 1905. He did not agree with me that I was just to keep that field as his tenant. He agreed with me that I was to take possession of the whole tract, look over it. There wasn't any agreement about that field; he just remarked that he would give me 25 or 30 acres, and cut it off in a uniform shape. From that time on I did not consider that field mine. When Mr. Knox gave me a deed to it, I considered it mine. That was

Hiram Knox. That was after the trial of this case in 1915. From the time Mr. Knox came there I claimed this land for the old man in his lifetime and Hiram Knox since then. I am still looking after this land, watching after it all the time. I think it was in the early summer of 1905 when Mr. Knox came there. * * * Right after Mr. Knox was there in the summer of 1905, I made additional improvements on the land. I put in right adjoining the field I had, and cleared up as much again as I had in. When Mr. Knox came there, I had 10 or 12 acres on the Isaacs league in cultivation and under fence, and that summer and fall I cleared about that much more, at least, if not more on this same Isaacs league that is in controversy in this suit. I fenced that. I was during that fall and winter clearing that additional amount. I made a crop on it the next year. * * * In other words, I cleared along for two years from the time Knox was there until I more than doubled the size of my improvements on the land involved in this suit. I fenced all of the new land that I cleared, and I worked it. I have made a crop on that land every year from the time Knox was there until now. I have cultivated every bit of it. I have kept a fence on it all the time. My fence has not been down any. After Mr. Knox was there in the summer of 1905, I took charge of and kept charge of all of the rest of this 354 acres. I have cut timber on the other part of the 354 acres. I cut rail timber and board timber off of it, and then I cut ties off of it. I went and saw Mr. Knox about cutting the tie timber. I cut the ties from about all over the tract. I was to cut nothing over 14 inches on the land. Nobody helped me except my boys. I don't hardly know how many ties I cut from the tract. I cut ties on the land for a part of two years. That was within a year or so after I had the agreement with Mr. Knox. I stopped others from making ties on the tract after the agreement with Mr. Knox. One time some fellows got across the line and cut a tree or two, and I went right in after them and put a stop to it. About a year after that time I had to run one of the same ones off again. It was outside of my field where they were cutting ties. It was above my field, back on the west side. I put them off of there because I had possession of the land, and was holding it. * * *

"I have not at any time been the tenant of anybody except J. H. Derrough and W. H. and Hiram Knox on that land up there. I stated that I stopped some fellows from making ties on the land after Mr. Knox was there in 1905. Another time some Slavonians came in there and pitched a camp and started up a camp there, and I notified Mr. Knox of that. I think he ran an injunction on them and stopped them. Mr. Knox got them off, and the ties rotted. They didn't even get the ties. People began to work timber around over the country after Mr. Knox was there in 1905. There was hardly a week when they were hacking ties but what I was all over this land. They were cutting ties around close to this land. That was after the railroad came in here. After Mr. Knox was in there, I had to make a round over this land every week for nearly a year. After that I kept watch. Since the timber has been cut, I don't go over it so often. I generally try to make a round once a

month. I told everybody I saw that I had this land in possession and was watching after it. * * *

"I occupied the land in controversy and held possession of it under the agreement with Derrough from the last of January or first of February, 1905—1895—until some time, probably, the early summer of 1905. I have had possession of of this land under W. H. Knox and Hiram Knox; that is, under the title passed to them, from the summer of 1905 until this day. I have never abandoned that possession or turned that field out or any part of it from 1895 up until now."

J. C. Derrough testified:

"* * * I knew J. H. Derrough in his lifetime. He was my father. My father lived at Cleburne at one time. He must have lived there for twenty-five years or more. He is now dead. * * * I had occasion during my father's lifetime to have a transaction concerning 354½ acres of land on the William Isaacs survey in this county. I corresponded with somebody down here about it. That was in the latter part of 1899, I believe, in the summer. I wrote to somebody down here. My father wanted me to sell the land for him. I can't recall at present who it was that I wrote to. The first person I wrote to referred me to a firm here, but I disremember who they were. I then wrote the firm a letter about the land and they replied to it. * * *

"Q. I will ask you what your father said to you about this matter after you told him that there must be a squatter on the land?

"Plaintiffs: We object to that, your honor. (Objection overruled.) A. He said that he knew there was some one on it. It did not seem to excite him or worry him or bother him. My father claimed this land in his lifetime. He claimed it until he sold it."

O. J. Brown testified:

"* * * I knew W. H. Garlington in the year 1895. I remember a circumstance of having gone to mill at the same place with Mr. Garlington in the early part of 1895 and a letter he got while he was at the post office that day. The post office and grist mill were at the same place. I rode back part of the way home with Mr. Garlington that day. We both traveled the same road plumb out to my house. Mr. Garlington and I were coming along together, and he took a letter from his pocket and broke it and read it, and he told me that he had received the letter in answer to one that he had written about some land. I read the letter. It was a letter in answer to one he had written, and in the letter it stated to him for him to go on this land and to see about it. I am talking about the land on the William Isaacs headright survey; and in the letter it stated for him to see about it, take charge of it, and keep people from trespassing on it, and he could clear him up a farm on it and have what he made on it for ten years and after that 'I won't be hard on you.' That letter was from Derrough. It was mailed from Cleburne, Tex. It was addressed to W. H. Garlington, Tebo, Tex. That was early in the spring, right after Christmas; it was either January or February, early spring. Mr. Garlington just says to me, 'What do you think

about it?' I says, 'I expect it is a pretty good offer,' that way. That letter referred to land on the William Isaacs, there where Mr. Garlington has got some land cleared. I suppose I am acquainted with the land involved in this suit—354 and some odd acres owned by Mr. Knox. That was the same land the letter referred to. I was over at Mr. Garlington's house a few days after that, and he and I walked over and looked around and about on the land, and I says, 'Here would be a pretty place to start your clearing if you are going to work.' That was on the head of a little branch, black land. He said, 'Yes, I believe it is.' We were looking around there, and I told him I believed that would be a good place to start to clearing. Right after that time Mr. Garlington cleared some on this land. That was along in January or February. He split some rails on it. At that time, Mr. Garlington was renting land. He was a poor man. He was a very poor man. He didn't have anything. He had a family. That was some time along in January or February, and he cleared some right after that, but I don't think he cleared any longer than that because he had to make a crop. He cleared some in the summer and fall of 1895. He put in something like 6 or 7 or maybe 8 acres of that land during the year 1895. He cleared some more land the following year, 1896. He had something like 10 or 12 acres of the land in this suit cleared and fenced by the end of the year 1896. He cultivated it the year 1896. He made a crop on it. He has cultivated and made a crop on that land ever since up until now. He has kept the fence up on it. I talked to him after that, and he said that he claimed that land under Derrough as a tenant. He claimed to be in possession of the entire 354 acres. I know of my own knowledge that he did look after the entire tract. I know that he stopped some people from trespassing on the tract. I know that he stopped some parties from making ties on the tract. I know that he made boards and cut rails and got wood and such timber as he needed off of the entire tract after that. I never heard him say that he claimed that land under anybody else besides Derrough. When Mr. Garlington began clearing on this Knox land involved in this suit, there was no other field or inclosure of any kind near there on any other tract of land. The land involved in this suit is rather a long narrow tract, that is, longer than it is wide. I should suppose that where he commenced his improvements on this tract was well over towards the center of the tract. He had no other field around there. Mr. Garlington built the house where he now lives in the fall of 1897."

John Gilbert testified:

"* * * I know W. H. Garlington. I am a brother-in-law to him. We married sisters. * * * I went to Mr. Garlington's house some time in February or the early part of the year 1895 with my family on a visit. We visited right along about then. I remember the circumstance of his having discussed with me a letter about some land about that time. He had got a letter from Mr. Derrough in regard to him settling on the land as his tenant, and we talked about it, and we also went over to where he had been chopping, making some brush heaps, and he showed me the land. He

(259 S.W.)

told me that was the land. The letter was with reference to his taking possession. He was just to clean up a field, 8 or 10 acres, and as well as I recollect he said in the letter that he wouldn't charge him any rent for ten years. The letter I read said for him to take charge of the whole tract and keep people off of it, and keep them from cutting his timber. It also said something about keeping people from settling on it, or something like that. He didn't want any intruders on the land. I don't remember what he said about what he would do after the ten years. That letter was to Mr. Garlington, W. H. Garlington. * * * Mr. Garlington wrote him a letter while I was there; wrote it on Sunday morning. I helped him write the letter. We discussed about what to put in it. Mr. Garlington asked me what I thought about it. * * * Mr. Garlington, among other things, wrote Mr. Derrough in that letter that he would accept his proposition. After that time Mr. Garlington continued to clear down there where he had shown me he was clearing. In the spring of 1895 Mr. Garlington didn't plant anything on that land; only planted some collard seed around in the burnt places. He did clear some on it in the summer of 1895. I believe he cleared some more after he laid by his crop. He fenced the land in the early part of 1896 with poles and rails, and made a crop on it. He added some more on it in 1896, and I don't think I made him but one more visit until I left this country. He had between 8 and 10 acres cleared on it by the time I left here in the latter part of 1896, I believe. He fenced that. * * * He put a fence around something like 1 acre and raised collards on it in the spring of 1895, and in the summer he cleared some more land. He kept clearing there in 1896."

Frank Ellison testified:

"I am acquainted with the land involved in this suit, being 354 acres known as the Knox tract on the Isaacs league. I was acquainted with it in the early part of 1895. There was no land fenced or cleared on it before 1895. Mr. W. H. Garlington commenced making some improvements, clearing some land on this tract, and making a field in the early part of 1895. He cleared a small place. He had some collards in there that year. That was where he had cleared a place. I got collards out of that patch that year. I got them pretty often. I got them whenever I wanted them. I might have got them when he wasn't there, too. When he commenced clearing on this tract of land in 1895, he commenced to clear out in the tract. That is pretty much the shape of the Knox tract. When Mr. Garlington commenced clearing on the Knox tract in 1895, in the early part, he commenced somewhere right along about here, I think (indicating). He put in a little collard patch there. He fenced in an acre or so that year. He enlarged that clearing in the summer and fall of 1895. I couldn't say exactly to what extent he enlarged it; he put him in some 8 or 9 or 10 acres maybe. In 1896 he fenced what he had cleared during the entire year, 1895. He made a crop on it that year. In the summer and fall of 1896 he cleared some more so as to make a total of about 12 acres. * * * When Mr. Garlington went on this land, he went there as a tenant is my understanding. He went there as a

259 S.W.—43

tenant for Mr. Derrough. That is what Mr. Garlington told me. After that, I think, he sorter claimed to have possession of the whole tract. He claimed to be looking after the whole tract, and keeping trespassers off; that is what he told me. * * * After 1905 I heard him say that he was the tenant of W. H. Knox. When he commenced enlarging his improvements several years later, that is, increasing it from 12 acres. He made his improvements on the Knox tract. He extended his improvements north after he commenced the second time. He might have cleared some on that tract in 1905, 1906, and 1907; I don't know. As to whether or not Mr. Garlington cut ties all over this entire tract of land will say I never did know of him going south of that Donahoe branch. I didn't go over the whole tract, but, wherever I did go, he had cut ties, quite a lot of them. I don't remember exactly when that was. It was along in 1907, and 1908. That was during the time he claimed to be holding under Knox. He hauled the ties out of the woods and disposed of them. I never did know of his stopping any person from making ties on the Knox tract. I heard that he stopped Keller, and Judge Padgett put some Slavonians out there, and somebody stopped them. I don't know whether it was Garlington or who. I never did hear Mr. Garlington say that he claimed that land under anybody except Derrough and the Knoxes. Mr. Garlington always told me that he did not claim under McKechney."

The appellants contend that the records on the first appeal and on this appeal are practically the same, and that the difference as made by the new evidence does not affect the issues tendered and decided. They say that Derrough, at the time of the former appeal, was a tenant in common with appellants, owning a half interest in the entire tract, and that either cotenant had the equal right to permit Garlington to use the few acres he had inclosed, but would have no right to permit him to appropriate all of it, and that fact, whether evidenced by the lease in evidence or otherwise, could not avail the cotenant who gave such permission to acquire a limitation title to the land.

We have set out the facts so that it may be seen that the record on which the Supreme Court passed when this case was before it on former appeal was very different from the record in the instant case.

Thomas J. Donahoe and his mother, Mrs. Jennings, were each the owners of an undivided one-half interest in the land. Thomas J. Donahoe, by deed, conveyed the whole of the 354½ acres to his stepfather, R. J. Jennings. His mother attempted to convey her half to her husband, R. J. Jennings. Later, she and her husband joined in a deed conveying all the land to Derrough, and but for the defective acknowledgment of Mrs. Jennings the title to the whole tract would have been passed to Derrough by that deed. Unquestionably, Derrough was buying the whole of the 354½ acres, and Jennings and his wife had the legal title to it, and attempted to and thought they had conveyed it

to Derrough. Derrough at no time ever regarded himself as a cotenant with appellant. He always asserted title to the whole tract. He placed Garlington on same, claiming it all. Garlington took possession of the whole tract for Derrough, and so held it until he was informed by Knox that he, Knox, had become the owner. Derrough sold by warranty deed the whole tract to Knox, who, when he found Garlington in possession of same, made a contract with him, under which Garlington continued to hold the land as the tenant of Knox, and materially enlarged his improvements, constantly looked after the whole of the premises, protected same against trespassers, and used same until the trial hereof.

[1-6] Appellants urge that, as they and appellee were tenants in common, the occupancy of the land by appellee and those under whom he claims would not be adverse to appellant. The possession of a cotenant will be presumed to be in right of the common title, and the tenant in possession will not be permitted to claim the protection of the statute of limitations, unless it clearly appears that he has repudiated the title of his cotenant and is holding adversely to such cotenant. Possession and payment of taxes alone on the property do not constitute the assertion of an adverse claim. There must be something more. Phillipson v. Flynn, 83 Tex. 583, 19 S. W. 136. In order to affect the cotenants with this adverse holding, notice of such fact must be brought home to them either by information to that effect given by the tenant in common asserting the adverse claim, or by such acts of unequivocal notoriety in the assertion of such adverse and hostile claim that they will be presumed to have notice of such adverse claim of right. But, when it appears that the tenant is in actual possession, asserting an exclusive right to the whole of the property under a deed or deeds conveying to him by specific description the property in controversy, and the cotenants in common know of the existence of such deeds, and there exist circumstances that show that the one so holding is claiming by virtue of such deeds, his possession will be considered in keeping with the title under which he claims, and will be regarded as adverse to the title of his cotenants. The registration of the deeds under which he claims is notice to his cotenants of their existence and of his adverse claim. Church v. Waggoner, 78 Tex. 203, 14 S. W. 581; Mayes v. Manning, 73 Tex. 43, 11 S. W. 136; Puckett v. McDaniel, 8 Tex. Civ. App. 630, 28 S. W. 360 (writ refused); Robles v. Robles (Tex. Civ. App.) 154 S. W. 230. The rule is well settled that, when one of several tenants in common executes a deed purporting to convey the entire premises to one who places his deed of record and enters into possession of the property, claiming title thereto, such possession is hostile to that of

the cotenants, and they are charged with knowledge of the hostile character thereof, and after the expiration of the statutory periods of limitation their rights will be barred. Olsen v. Grelle (Tex. Com. App.) 228 S. W. 927; Id. (Tex. Civ. App.) 190 S. W. 240; Robles v. Robles (Tex. Civ. App.) 154 S. W. 230.

The facts in the record warrant the conclusion that this case falls within the principles above stated, and hence the court did not err in holding an ouster was shown and rendering judgment for appellee.

But counsel for appellants says:

"By reason of their ownership in common, both Derrough and these appellants (or those under whom they claim) were in constructive possession of the entire tract, and that constructive possession shared in equally to the extent of their record title was not interrupted by the encroachment of Garlington, either with or without the consent of one or both cotenants."

[7, 8] We do not believe the doctrine of "encroachment" under the facts applies to this case. Encroachment occurs where one who owns adjoining land and has improvements thereon extends his improvements over his line on to the adjoining land, and thus occupies and uses the land thus inclosed. Here Garlington did not own any land adjoining the premises in question, or elsewhere. He took possession of the land in question under a written agreement with Derrough, who held a deed to and was claiming the entire tract, and by reason of that agreement was the tenant of Derrough in charge of and using the inclosed land and looking after the whole tract. This relation continued from the early part of 1895 up to 1905, when Garlington made a contract with Knox to hold and look after the land for him. Moreover, the first land cleared and fenced and used by Garlington as the tenant of Derrough was near the center of the tract and was gradually extended to near the edge. It was in no sense an encroachment over the line from without, but was a beginning within and an extension outward.

Garlington testified:

"I suppose I commenced 250 or 300 yards over in the tract. I got about an acre or so cut off during the spring and summer. I also burned brush and split rails over there. In the summer, after I got through with my crop, I went ahead and cleared up 7 or 8 acres. That was in the summer of 1895. * * * I went there in the winter of 1895 and 1896 and split rails and fenced up this land and planted it in 1896. I fenced it up in the fore part of the year 1896, as soon as I cut my rails. * * *

"It is not a fact that the first land that I cleared up there was not on this 354 acres. It is not a further fact that for several years I only had a small encroachment over the line as part of the Derrough field."

Brown testified:

"When Garlington began clearing on this Knox land involved in this suit, there was no other clearing or field or inclosure of any kind near there on any other tract of land. The land involved in this suit is rather a long narrow tract; that is, it is longer than it is wide. I should suppose that where he commenced his improvements on this tract was well over towards the center of the tract. He had no other field around there."

Ellison testified:

"When he commenced clearing on this tract of land in 1895, he commenced to clear out in the tract. * * * He cleared kind of towards the north line first, and then later he came this way (indicating). That was in 1895. In 1896 he fenced what he had cleared during the entire year, 1895. In the summer and fall of 1896 he cleared some more, so as to make a total of about 12 acres. * * * When Mr. Garlington first began clearing on this tract I believe he began a little closer to this east line than the west line. It was pretty well out in the center of the tract as between the two."

Mitchell testified:

"The first clearing that Mr. Garlington did on the Knox tract in the early part of the year 1895 was pretty close to the center of the tract with reference to the east and west lines. When he commenced clearing of the Knox tract in 1895, there wasn't any other field adjoining the Knox tract. That field never did connect with any other field afterwards. It is still there separate from the surrounding improvements. It is still there separate from the others and on the Knox tract. By 1898 Mr. Garlington had a right nice little field cleared out here on the Knox tract, but I don't remember how many acres, and he had a good fence around it."

This testimony is without dispute. It thus appears that the doctrine of encroachment is not made to appear. But appellants say:

"It appears, however, that there is no basis for the ten years plea even if Derrough were not a tenant in common with appellants, because clearing the brush off the land in 1895, and putting some of it in cultivation in 1896, as Garlington testified, did not cover a period of ten years up to 1903 or 1904, when the deed was made to Garlington's wife, purporting to invest her with the title to the 100 acres of land reaching over and including the field on the land in controversy."

It appears from the record that one John McKechney claimed some portion of the Isaacs survey. He had E. P. Padgett and S. P. McElroy representing him in the matter. Garlington was then living on and had fenced and was using some of the land that was a part of the portion claimed by McKechney. This McKechney claim included the 354½ acres here in controversy as well as other portions of the Isaacs league. It seems that the claim was for 1,107 acres.

McElroy attempted to get a tenancy agreement from Garlington on the 354½ acres. Garlington refused to make any such agreement. Along about this time McKechney made a deed to 100 acres of the land he claimed on the Isaacs to Mrs. Garlington, the wife of W. H. Garlington.

Relative to this deed, Garlington, on cross-examination, testified:

"I never saw the deed until about a month ago. I wasn't at home when the deed was made, and they told me that McKechney had made me a deed too, I believe, 100 acres of land, and I never saw the deed until about a month ago. While hunting for papers I ran across that deed. That deed is made to Mrs. S. A. Garlington. Mrs. S. A. Garlington is my wife. That deed, I reckon, is right there in that trunk now.

"I think the land conveyed in that deed includes a portion of the Derrough tract. That deed was made to my wife. That deed was at my house in my possession about a month ago. I never read that deed until a month ago. I heard of it right straight after it was made. My wife and I did not claim a part of this Derrough tract of land under the McKechney deed."

On redirect examination he testified:

"I never did claim any land under McKechney. McKechney came in there and claimed 1,100 and some odd acres that took in a big territory there. I said, 'Now, you have got a lawsuit on your hand when you run onto me.' He said, 'No, no, I ain't going to have any lawsuit with you, I am going to give you yours.' I told him to sue me, because I knew he didn't have any claim."

S. P. McElroy testified:

"I represented John McKechney along in 1903, 1904, and 1905. He claimed several hundred acres of land on the Isaacs league in Sabine county. As one of his representatives I undertook to recover that land for him. I went upon the land and made investigations, and took such action as I thought necessary to recover the land. I knew W. H. Garlington at that time. He was living on and had under fence some land which comprised a part of the land Mr. Kechney wanted to recover. With a view of recovering that land, I undertook to place tenants on it and obtain acknowledgments of tenancy for years in the past. I went to see W. H. Garlington. The McKechney claim which I represented covered 354½ acres on the Isaacs league then claimed or owned by W. H. Knox. It also covered other portions of the Isaacs league. * * * I visited the community in which Garlington lived along in 1903 or 1904, working on the McKechney claim. Mr. Garlington at that time had in cultivation and under fence some land on the Knox tract, being the land in controversy. I approached W. H. Garlington with a view of having him say or claim that he had been the tenant of McKechney in the past or by which I would get an agreement from him that he was then the tenant of McKechney and would be from then on on this Knox tract as well as other lands there. W. H. Garlington did not agree to be the tenant of McKechney; he wouldn't agree.

I never did get him to agree to be McKechney's tenant. I never did get him to talk much about it. I think Mr. McKechney made a deed to Mr. Garlington for 100 acres of that land. The best of my recollection, that deed was made to Garlington's wife. I really couldn't tell you what the object was in making that deed. Judge Padgett was practicing law, and I was working on the outside business. I don't know what his idea was for having McKechney made that deed. I do not know why the deed was make to Garlington's wife instead of him. I talked to Mr. Garlington several times about this matter. He at all times refused to be McKechney's tenant. As to whether or not he ever told me that he was claiming the land under Mr. Derrough as his tenant I will say I can't remember the man's name that he said he was working under. He told me that he was claiming the land under some one. I don't remember whether it was Derrough or not. He did tell me he was claiming under other parties, and refused to be McKechney's tenant. He never at any time agreed with me to be McKechney's tenant."

E. P. Padgett testified:

"Mr. McElroy and I had along about that time as a client one John McKechney. * * * As a result of my employment there by McKechney I drew a deed to Mr. Garlington or to his wife. That deed was from John McKechney. I wouldn't say whether it was to Mr. Garlington or to his wife or to both. Mr. Garlington never did claim under that deed to me."

So it appears that Garlington did not accept the deed from McKechney, nor make any claim thereunder, but steadfastly refused McKechney's offer, and continued to claim for Derrough, and after him for Knox. It does not appear that the deed in question was ever placed of record.

In the first trial Garlington's entry upon the land was not explained. From the record there it appeared he was found as a squatter upon the land by Knox, and then he made a contract of tenancy with Knox. The record did not show how Garlington came on the land originally, and was silent as to his claim. It did not show that he was or ever had been connected with any one who held a conveyance to the land, or that his possession had been taken under such a one. It did not show that after his contract with Knox Garlington enlarged his improvements to about twice what they were before.

As now reflected, the record, summed up, shows that Derrough, with a deed on record specifying the boundaries of the entire tract, in 1895 placed a tenant, Garlington, in possession of the land; that Garlington at once began clearing land for cultivation at a point near the center of the tract; that he gradually enlarged his improvements, and continuously cultivated and used and held same as a tenant of Derrough until 1905, when he made and entered into a contract of tenancy with Knox, who had become the owner of the land, and has continuously held possession, used, and looked after the entire tract of land for Knox up to the trial of this case. The cases of Titel v. Garland, 99 Tex. 206, 87 S. W. 1152, and Holland v. Nance, 102 Tex. 177, 114 S. W. 346, cited by the Supreme Court in reversing this case on former appeal, are not applicable under the facts as now developed.

The judgment of the court below should be affirmed, and it is so ordered.

Affirmed.