**WELCH et al. v. ARMSTRONG et al.**

No. 4359.

Court of Civil Appeals of Texas. Texarkana.

June 15, 1933.

Rehearing Denied June 22, 1933.

Clinton S. Bailey, of Dallas, P. O. Beard, of Marshall, and Truett, Abernathy & Wolford, of McKinney, for plaintiffs in error.

Young & Stinchcomb, Bramlette & Meredith, Jas. T. Casey, and Campbell, Lee Taylor & Leak, all of Longview, and R. E. Seagler, of Houston, for defendants in error.

SELLERS, Justice.

The suit was by Mrs. Emma Clark, a widow, and her daughter, Mrs. B. W. Welch, joined pro forma by her husband, against T. M. Armstrong and the Humble Oil & Refining Company, a corporation, in the statutory form of trespass to try title to two tracts of land aggregating 140.5 acres according to the calls of the deed. The plaintiffs specially pleaded the title and source of title and claimed an undivided one-sixth interest in the land; Mrs. B. W. Welch owning in fee the one-sixth interest and Mrs. Emma Clark owning a one-third life estate in the one-sixth interest. The plaintiffs also sought recovery of one-sixth of the bonus, rentals, and royalties in virtue of the lease of all the land by T. M. Armstrong to the Humble Oil Company for oil production.

The defendant T. M. Armstrong pleaded not guilty and the statutes of limitation of three, five, ten, and twenty-five years.

The defendant Humble Oil & Refining Company pleaded as the defendant T. M. Armstrong, and, in the alternative, that, in the event of recovery by plaintiffs, they be charged with pro rata cost and expense of drilling the oil wells and in production of the oil.

After hearing the evidence, the trial court peremptorily instructed the jury to return a verdict in favor of the defendants, and judgment was rendered that plaintiffs take nothing by their suit, and in favor of the defendants that the title of the land be vested in T. M. Armstrong subject to the lease of the land to the Humble Oil & Refining Company. The plaintiffs have appealed from the judgment, seeking review of the ruling of the court in giving the peremptory instruction of the jury.

John K. Armstrong, Sr., is the common source of title. He was married twice, and to the first marriage were born nine children, four of whom died without being married, and to the second marriage were born three children, one dying in infancy, and the other two being Lucian J. Armstrong and John K. Armstrong, Jr. John K. Armstrong, Jr., is the father of the defendant T. M. Armstrong, and Lucian J. Armstrong was the husband of plaintiff, Mrs. Emma Clark and is the father of Mrs. B. W. Welch, née Armstrong.

John K. Armstrong, Sr., died in 1859, and in April, 1861, his estate was partitioned by decree of the district court of Upshur county in a partition suit duly filed by his widow. Margaret Armstrong, against the children by the first wife, Sarah A. Armstrong, deceased. By the decree, 200 acres of land, including the land in this suit, together with other land, was set apart as a homestead for the wife, Margaret Armstrong, to be used by her during her natural life, and at her death then to vest and be equally divided. The portion of the decree, as material to state, reads: "And it is further adjudged and decreed that the said plaintiff Margaret Armstrong, she being the surviving widow of John K. Armstrong, deceased, take and have and recover two hundred acres of land out of the Estate of John K. Armstrong, deceased, including the homestead to be surveyed in any manner she may see proper so it does not unnecessarily or materially damage the residue of the land, to be used and enjoyed by her, the said Margaret, for and during her natural life, and that the residue of the land of the said John K. Armstrong deceased, be divested out of the said Margaret Armstrong and invested in all the heirs of the said John K. Armstrong, deceased, and to be equally divided between said heirs. It is further adjudged and decreed that at the termination of the said Margaret Armstrong's lifetime estate in the said two hundred acres including said homestead then the same shall vest in all the heirs of the said John K. Armstrong to be by them equally divided between said heirs."

The heirs who inherited the land were the children of the first marriage, John F., Martin G., Monroe A., Nancy, and Elizabeth, and the children of the second marriage, Lucian J. and John K., Jr. The homestead included in the 200 acres was the homestead on which John K. Armstrong, Sr., and his second wife, Margaret, had lived from the time of their marriage in 1855 until the death of John K. Armstrong, Sr., in 1859. After the decree mentioned, Mrs. Margaret Armstrong lived on the land as her homestead until her death in 1908. The two sons, Lucian J. and John K., Jr., were born on the land, and after their marriage lived on it until the times here-

inafter stated. It was proven that at a time long before Mrs. Margaret Armstrong died in 1908 three children of the first marriage, M. A. Armstrong, the heirs of Monroe Armstrong, and John F. Armstrong, conveyed their undivided interest in the land to John K. Armstrong, Jr., placing in him, with his inherited interest included, a four-sevenths interest in the land.

Lucian J. Armstrong with his wife and infant child, now Mrs. B. W. Welch, moved in 1897 to Bandera county and then to Coke county, where he died in 1899. In 1899 following his death, the widow and daughter of Lucian J. Armstrong removed back to the county where the land in suit is located. They did not go upon the land and again occupy it as before leaving in 1897, but lived at another place all the time since 1899. Mrs. Clark lived within a mile of the land since 1899 with the exception of two years. The daughter, Mrs. B. W. Welch, lived for some years with her mother, and after grown to womanhood worked away for a telephone company until her marriage. They never claimed the land until after April, 1931, when the oil boom started, and they never claimed any part of the rents of the land and never paid any taxes.

It was proven without dispute that John K. Armstrong, Jr., lived on the land all his lifetime except during some eight or nine years during which time he lived in Longview. While living in Longview, the land was rented to tenants by John K. Armstrong, Jr. Upon his marriage he built a house on the land, and he and family lived in it, and after its destruction by fire he rebuilt a residence on the land and lived in it with his family. The entire tract is fenced, and about fifty acres cultivated and the rest used as pasture and woods lot. After his mother's death, John K. Armstrong, Jr., on June 13, 1913, executed a deed conveying 6 acres of the land to the Gladewater Cemetery Association. On April 20, 1915, he conveyed by deed to E. T. Norton 14⅓ acres of the land. On November 1, 1916, John K. Armstrong, Jr., joined by his wife by deed conveyed by metes and bounds the entire land, except the portions previously sold, to his son, T. M. Armstrong, the defendant in this suit. The deed recited as consideration the sum of $3,500, evidenced by three vendor's lien notes. There was due delivery, respectively, of the deed and the consideration. The deed was duly registered in the county clerk's office on November 29, 1916.

It was proven without dispute that upon the execution of the deed by his father on November 1, 1916, T. M. Armstrong went into possession of the land and mortgaged it to secure money, and has continuously since that time cultivated, used, and enjoyed it and rendered it for taxes in his own name and paid all taxes when due to time of this

suit, and claimed the land as his own. A number of witnesses testify as to the sole use and occupancy of the land by T. M. Armstrong. The mortgage given by T. M. Armstrong was duly recorded in the county clerk's office.

There was evidence in behalf of T. M. Armstrong that Lucian J. Armstrong sold the land in suit to his brother, J. K. Armstrong, Jr., by parol sale in 1897. Mr. York testified: "I know the occasion of Lucian Armstrong leaving this country. It was somewhere about twenty or twenty-five years ago, or maybe longer. I had a conversation with Lucian Armstrong four or five days before he left. He said he had sold out and was going to South Texas. Since the death of Mrs. Margaret Stewart (1908) and since Lucian Armstrong left the Armstrong place (1897), J. K. Armstrong took charge of it. Tom (T. M.) Armstrong has occupied it as his own for twelve or fifteen years or more."

Mr. Clements testified: "I knew Lucian Armstrong in his lifetime. He lived in the old Stewart house, beyond John Armstrong's house, on a part of the John K. Armstrong homestead. That was a part of the land where Tom (T. M.) Armstrong lives now. He left in 1897. I heard a conversation between Lucian Armstrong and his brother J. K. Armstrong, a couple of weeks, or such matter, before Lucian Armstrong left that place, with respect to disposing of his interest in the old Armstrong homestead. I went over there to see Mrs. Armstrong one morning, she being sick, and while I was there Lucian Armstrong came in and said, 'I am going to leave the country, and want to sell my interest in the place.' John said, 'What will you take?' And Lucian told him, 'I have not got but one mule and I want to leave in a wagon, and if you will give me a horse you have got and a wagon and either five or seven head of cattle, you can have my interest in the place, and we will fix up the balance in a few days.' I do not know whether he meant a deed or what. No deed passed at that time. J. K. Armstrong and Lucian Armstrong reached an agreement on that proposition. J. K. Armstrong said, 'I will give it to you, Lucian.' I do not think it was over a month before Lucian Armstrong left. He took a horse and wagon and cattle (from J. K. Armstrong). He had a mule of his own, and he left the country. He never did return. He died out there (in West Texas). He was married at that time, and I think he had one child. Since Lucian Armstrong left the place (1897), J. K. Armstrong occupied it, until he went to Longview where he remained eight or nine years, about twenty-five years."

T. M. Armstrong testified: "When he (Lucian) left (in 1897) my father traded him a horse that I was very fond of, and I think four or five or six head of cattle, and a wagon.

The reason I remember so well about the horse is that we were all very fond of the horse and none of the family wanted him to take the horse off. He left soon after that. I have never seen him since. My father's family and my grandmother lived on the property after he (Lucian) left. I think she had been off the place about three or four years when she died in 1908."

In behalf of the plaintiffs, Mrs. Emma Clark testified: "My husband and I started to move to West Texas in April, 1897. We never did get a horse, wagon and some cattle from John K. Armstrong, Jr., a short time before moving West. We raised the team used in moving West, a horse and a mule. We got the wagon from my father, Mr. Stovall, about a month before we moved. The first time I ever heard that my husband had sold his interest in the land to J. K. Armstrong, Jr., for a horse, wagon and some cattle was at this trial. I never heard of it before. * * * I have never asked for any rent off the place. I knew he (T. M. Armstrong) was getting the rent off of it and I thought he would keep it up. I never rendered any part of the land for taxes. I never asked Mr. Armstrong for any rent. I lived within a mile of the place for thirty years, and knew they were on the place all the time and knew they were cultivating it and was getting whatever was made on it, and knew that they were not paying any rent. * * * I thought the value of the land was so small is the reason I did not claim and ask for any rent,—it was not worth very much and I knew the taxes had to be paid."

Mrs. B. W. Welch testified that she visited the Armstrongs on the place and knew they were using it, and that she never claimed any rents nor paid any taxes nor asked for any interest until "the oil discovery came on." She stated:

"Q. Why hadn't you claimed any rents? A. Well, the land was very poor and nor worth anything hardly; and I supposed it took all to pay the taxes, that was the reason. I never gave them any notice I was claiming an interest."

The defendants offered in evidence a deed from Lucian J. Armstrong and wife, Emma Armstrong, to J. W. Simmons, of date January 7, 1897, conveying "all of our undivided interest" in the land in suit. The deed was duly acknowledged, and was duly recorded in the deed records of Gregg county on May 18, 1897. This present suit was filed in 1931. The plaintiff Mrs. Emma Clark (formerly Mrs. Emma Armstrong) filed an affidavit in the case that the signatures to the deed were a forgery. Mrs. Emma Clark testified in the trial:

"Q. Mrs. Clark, did you and your husband Mr. Armstrong ever sell his interest in the old Armstrong home place to anybody? A. No, Sir.

"Q. There is a deed of record on the deeds of Gregg County which purports to be a deed from Lucian J. Armstrong and yourself to J. W. Simmons conveying an undivided interest in the land in suit. Did you ever sign such a deed as that? A. No, Sir. I never knew anything about it until April of last year, 1931.

"Q. Your statement is, you never executed any such deed? A. Yes, Sir.

"Q. The deed recites a consideration of $350.00 in cash. Did you all get that? A. We never had $350.00 in cash in our whole married life at any one time.

"Q. About the time you moved West (in 1897) did you have any money at all? A. We left here with about $50.00 in money."

 The above statement fairly shows the evidence adduced. It is concluded that it may not be held that there was error in instructing a verdict for defendants. It conclusively appears from the evidence that title to the land was legally vested in T. M. Armstrong by adverse possession for the duration and continuity of the full statutory period. The determination of that single question, of the right of T. M. Armstrong to acquire title to the entire property by adverse possession, settles the entire controversy in the case, and renders any other question raised entirely immaterial. On November 1, 1916, John K. Armstrong, Jr., a tenant in common, and in possession, Mrs. Armstrong, the life tenant, being dead, executed and delivered a deed to T. M. Armstrong conveying absolute ownership of the entire land for a consideration presumably of the full value of the property. The purchase by T. M. Armstrong did not create a tenancy in common with the remaining owner. Cotenancy is not an estate but a relation of one person to another. A conveyance by a tenant in common of the common property to a third person terminates the cotenancy between himself and his cotenant. 62 C. J. § 19, p. 418. There is no longer a concurrent ownership of the property between them. And a purchase by one not a cotenant from one a tenant in common, of the whole property, and not an undivided share, does not create a cotenancy. 62 C. J. § 9, p. 414. At the time of the deed to him, T. M. Armstrong was in the relation to the title purely of purchaser, for a valuable consideration, and consequently he was in legal effect a stranger to the title. In the case cited by appellants of Hutchens v. Denton, 83 W. Va. 580, 98 S. E. 808, a deed by a cotenant to his heirs was held to be made, not to a stranger, but to privies in estate. The deeds there made appear to have been "voluntary and without consideration, and were made as

advancements or as gifts to said children." That case is upon different facts and would not be applicable to the present one.

██ ██After the deed to him purporting to convey the absolute ownership of the entire property, T. M. Armstrong took possession claiming full ownership under circumstances charging the plaintiffs in this case with knowledge of the adverse claim. It is undisputed that T. M. Armstrong entered into the possession and use of the land which was adverse, continuous, open, and exclusive to the time of the suit, being about fifteen years. The deed was recorded. Article 6646, R. S.; Puckett v. McDaniel, 8 Tex. Civ. App. 630, 28 S. W. 360; and other cases. The plaintiffs knew of his possession. As to whether the acts, which are undisputed, amounted to a disseisin so as to start the operation of the statute of limitation is a question of law for the court. 62 C. J. § 60, p. 444. It is believed that the legal effect of the facts is to establish an ouster. Olsen v. Grelle (Tex. Com. App.) 228 S. W. 927; McBurney v. Knox (Tex. Com. App.) 273 S. W. 819; Id. (Tex. Civ. App.) 259 S. W. 667; Robles v. Robles (Tex. Civ. App.) 154 S. W. 230; Huling v. Moore (Tex. Civ. App.) 194 S. W. 188. See 32 L. R. A. (N. S.) 702, and note. The case of Long v. McCoy (Tex. Civ. App.) 294 S. W. 663, is different facts and not applicable. The court in that case clearly explains the rule to be that, while possession of a stranger claiming under deed of entire land is notice of adverse character, yet it does not become conclusive notice of adverse holding where "one tenant in common" takes and records a deed to the whole tract "from another tenant in common or from a stranger."

The judgment is affirmed.